UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHRISTOPHER PETROPOULOS and LORI PETROPOULOS, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| CITY OF CHICAGO, | ) ) |
| Defendant. | ) ) ) |

Case No. 19-cv-03206

Hon. Steven C. Seeger

## MEMORANDUM OPINION AND ORDER

Plaintiffs Christopher and Lori Petropoulos received copies of their bank statements in the mail one day. But the information didn't come from their bank. It came from a prisoner.

The inmate, it turns out, obtained the records from the City of Chicago through a FOIA request. By mistake. The prisoner submitted a FOIA request about his criminal case. Instead of sending him what he had requested, the City sent him the financial records of the Petropoulos family. The prisoner, in turn, passed along the personal banking information to the Petropouloses.

Receiving their personal financial records from a convicted felon greatly alarmed the Petropoulos family. So they sued the City under section 1983 for violating their right to privacy under the Fourth and Fourteenth Amendments. They also advanced various state-law claims including negligence, negligent supervision, and negligent infliction of emotional distress.

The City moved to dismiss the original complaint, and the Court granted the motion, concluding that the pleading did not state a claim under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978). But the Court granted Plaintiffs leave to amend.

The Petropouloses later filed an amended complaint, advancing the same basic theory of the case with a few additional factual allegations. Plaintiffs also added three more state-law claims: invasion of privacy, intrusion, and willful violation of the Illinois Freedom of Information Act.

Now, the City has moved to dismiss a second time, arguing that the complaint does not state a claim under *Monell*. The motion is granted. Because no federal claims remain in the case, the Court declines to exercise supplemental jurisdiction over the state-law claims.

## Background

This case is about the City's botched response to a FOIA request, which caused an inmate to receive the banks statements of Christopher and Lori Petropoulos.

The story begins with the City somehow coming into possession of the financial records of the Petropoulos family. The complaint doesn't reveal how, exactly, the City obtained their personal information, except that the records were "delivered to the Defendant by mistake." *See* Am. Cplt., at ¶ 10 (Dckt. No. 32). However it happened, the City got its hands on the bank statements of the Petropoulos family.

Things went from bad to worse. An inmate submitted an unrelated FOIA request for information about his arrest and conviction. Instead of sending him that information, the City responded by mailing him the Petropouloses' private financial records. *Id.* at ¶¶ 9–10. The inmate's FOIA request had nothing to do with the Petropouloses, but the City sent the inmate their financial records anyway. The City "improperly and carelessly" provided their personal information to the inmate. *Id.* at ¶ 10.

The City didn't notify the Petropouloses of the error. *Id.* at ¶ 11. The family first learned of the mistake when they opened unexpected mail from an inmate and found their financial

records. *Id.* ("[T]he Plaintiffs were not informed that the felon possessed the Plaintiffs' personal and private information until the felon mailed the documents to the Plaintiffs."). Since then, the Petropouloses have "remain[ed] in a state of compromised safety and fear" because the City "disclosed significant details" about them "to a known violent felon who is currently incarcerated for murder." *Id.* at ¶¶ 12, 25.

In their initial complaint, Plaintiffs claimed that the City failed to properly train its employees how to respond to FOIA requests, and failed to properly supervise them, too. *See* Cplt., at ¶ 14 (Dckt. No. 1). They also claimed that "the City, the Police Department, and the Police Department's Record Manager / FOIA Officer obviously do not have practices and policies in place to protect the Plaintiffs' personal and private information from being disclosed." *Id.* But they only named the City as a defendant.

This Court granted the City's motion to dismiss and gave Plaintiffs leave to amend. *See* 3/24/20 Mem. Opin. and Order (Dckt. No. 28). The Court ruled that Plaintiffs did not sufficiently allege that any City policy (or lack of a policy), custom or practice, or failure to train caused the injury. *Id.* at 7, 9, 11.

When addressing the absence of a policy, custom, or practice, the Court held that the complaint was based "entirely on their own personal experiences" and "allege[d] no other examples of the City releasing the wrong information to the wrong recipients." *Id.* at 7. "Raw conclusions about inadequate policies and practices don't cut it, but that's all the complaint has to offer." *Id.* And the same was true for the allegations about the failure to train. *Id.* at 10 ("Plaintiffs' conclusory allegations about the City's failure to train suffer the same weaknesses as the allegations about a policy."). Plaintiffs "merely allege[d] that there wasn't enough training,"

3

and that allegation was "too generic to support an inference that the City itself caused their injuries." *Id.* at 11.

Plaintiffs later filed an amended complaint. *See* Am. Cplt. (Dckt. No. 32). By and large, the core allegations in the amended complaint are the same as the original complaint. But Plaintiffs added a few new facts about post-dismissal FOIA requests. *Compare id.* at ¶¶ 14–19 *with* Cplt. (Dckt. No. 1).

After dismissal, and before filing an amended complaint, Plaintiffs submitted FOIA requests to the City. *See* Am. Cplt., at ¶¶ 14–19. The City denied those requests. *Id.* Plaintiffs included the requests themselves and the City's responses as exhibits to the amended complaint. *See* Exhibits to Am. Cplt. (Dckt. No. 32, at 15–23 of 23). In the first request, Plaintiffs' attorney, Jessica Harrill, sought the following:

> Any records regarding FOIA request responses where the incorrect document(s) was sent to the requester, including any records sent by mistake or were [sic] otherwise irrelevant. This includes any letters, notes in files, emails, copies of responses, or any correspondence with requesters indicating the requester did not receive the information they wanted or received information not relevant to their request.

*See* 4/30/20 FOIA Request (Dckt. No. 32, at 15–16 of 23). The request included a specific stretch of time: "For the time period of January 1, 2018 to present." *Id.*

The City responded that the request "is unduly burdensome" and that "CPD's burden to process your request outweighs the public's interest." *See* 5/11/20 Letter (Dckt. No. 32, at 17–18 of 23). The City also stated that "there is no way to track, query, or limit a search of response records categorically as you are seeking." *Id.* The City then invited Harrill to narrow the request. *Id.* "If you do not reduce the request, it will be treated as a denial." *Id.*

Harrill modified the request that same day. *See* Am. Cplt., at ¶ 16 (Dckt. No. 32). In the revised request, she sought the following:

4

> Any records regarding FOIA request responses where the incorrect document(s) was sent to the requester, including any records sent by mistake. This includes any notes in files, emails, or any correspondence with requesters indicating the requester received a response by mistake. For the time period of January 1, 2019 to present.

*See* 5/11/20 FOIA Request (Dckt. No. 32, at 19–20 of 23). So this second FOIA request was narrower than the first in three ways: (1) it shortened the time period, (2) it reduced the scope of the request from "irrelevant" FOIA responses to only "incorrect" responses including "records sent by mistake," and (3) it didn't ask for letters or copies of responses. *Id.*

The City responded the next day. *See* 5/12/20 Letter (Dckt. No. 32, at 21–22 of 23). Again, the City denied the request. *Id.* And it provided the same reason for the second denial. *Id.* ("CPD has determined that compliance with your request is unduly burdensome . . . . The request is broad/burdensome because there is no way to track, query, or limit a search of response records categorically as you are seeking . . . .").

Harrill then wrote to the City about the responses. *See* 5/12/2020 Letter (Dckt. No. 32, at 23 of 23). She noted that her firm "narrowed down the scope of the request, but the only difference in the responses is the text language of the FOIA requests." *Id.* "What is interesting about this is the second letter we received from your office quotes language from the first request that was since deleted in our new request." *Id.* Harrill indicated that her letter served as a renewal of their FOIA request with clarification, and that she expected a response within five business days. *Id.*; *see also id.* (clarifying that the request "is for 'any notes in files, emails, or any correspondence with requesters indicating the requester received a response by mistake'"). But the firm never heard back from the City. *See* Am. Cplt., at ¶ 18 (Dckt. No. 32).

In addition to the new facts, Plaintiffs added three new state-law claims. *Id.* at Counts VI to VIII. Count VI alleges that the City violated their right to privacy under the Illinois

5

Constitution. *Id.* at ¶¶ 62–68. Count VII claims that the City "created an unauthorized intrusion of [their] privacy." *Id.* at ¶¶ 69–73. And Count VIII alleges that the City willfully violated the Illinois Freedom of Information Act. *Id.* at ¶¶ 74–78.

The amended complaint also included the other five counts in the initial complaint: Counts I and II allege violations under section 1983 of Plaintiffs' right to privacy. *Id.* at ¶¶ 29–41, 42–44. Counts III, IV, and V allege state-law claims for negligence, negligent supervision, and negligent infliction of emotional distress. *Id.* at ¶¶ 45–50, 51–54, 55–61.

At this point, the question for the Court is whether the new material in the amended complaint is enough to state a *Monell* claim. After reading the pleading as a whole, the Court concludes that the new complaint suffers from the same defects as the old one. The amended complaint does not contain enough factual content to state a *Monell* claim. The lack of a viable federal claim means that the Court will dismiss the remaining state-law claims, too.

## Legal Standard

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not the merits of the case. *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). At this early stage, the Court assumes the truth of the well-pleaded facts in the complaint, including the exhibits. *See Forrest v. Universal Savings Bank, F.A.*, 507 F.3d 540, 542 (7th Cir. 2007). A court normally cannot consider evidence outside the pleadings on a motion to dismiss without converting it to a motion for summary judgment. *See Hecker v. Deere & Co.*, 556 F.3d 575, 582–83 (7th Cir. 2009). But an exhibit to the complaint is deemed to be part of the complaint itself, so it is fair game on a motion to dismiss. *See Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013).

"To survive a motion to dismiss under Rule 12(b)(6), the complaint must provide enough factual information to state a claim to relief that is plausible on its face and raise a right to relief above the speculative level." *Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 333 (7th Cir. 2018) (quotation marks and citation omitted); *see also* Fed. R. Civ. P. 8(a)(2) (requiring a complaint to contain a "short and plain statement of the claim showing that the pleader is entitled to relief"). A court must ignore "legal conclusions and conclusory allegations merely reciting the elements of the claim." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009)).

## Discussion

The City argues that the amended complaint, like the original complaint, fails to state a claim under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978). The Court agrees. The new details about the FOIA requests do not cure the deficiencies of the original complaint. The federal claims (Counts I & II) are dismissed. With the federal claims dismissed, the Court declines to exercise supplemental jurisdiction over the state-law claims.

**I.   The Section 1983 Claims**

Counts I and II are identical, so the Court analyzes them together. Plaintiffs are suing the City under section 1983, claiming that the City violated their constitutional right to privacy.[1]

Plaintiffs argue that the details about the "culmination of [their] experiences with the Defendant" are enough to survive a motion to dismiss. *See* Pls.' Resp. to Mtn. to Dismiss, at 3–4

---

[1] Count I is a section 1983 claim against the City, and so is Count II. *See* Am. Cplt., at ¶¶ 29–41, 42–44 (Dckt. No. 32). In Count II, Plaintiffs mention a "Chicago Police Department FOIA Officer." *Id.* at ¶¶ 43–44. But only the City of Chicago is named as a defendant. *Id.* at ¶ 1 ("Plaintiffs . . . bring this action against Defendant, CITY OF CHICAGO . . . ."). When dismissing the initial complaint, this Court noted that Plaintiffs might have intended to sue the FOIA officer, but did not include him or her as a defendant. *See* Mem. Opin. and Order, at 3 n.1 (Dckt. No. 28). The amended complaint did not name a new defendant, so Count II is once again duplicative of Count I.

(Dckt. No. 39). That is, they argue that the City mishandled both the inmate's original FOIA request and their two new FOIA requests, and those three actions establish a broader policy, practice, or custom. They also argue that the allegations are sufficient because the Court can't apply a "heightened pleading standard" to *Monell* claims. *Id.* at 2 (quoting *White v. City of Chicago*, 829 F.3d 837, 844 (7th Cir. 2016)).

It's true that there is no heightened pleading standard under *Monell*. But *Monell* did not lower the bar for pleadings, either. Courts "should not accept as adequate abstract recitations of the elements of a cause of action or conclusory legal statements." *See Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009).

*Monell* limits constitutional claims against municipalities. "Local governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell*, 436 U.S. at 690. A local government cannot be held liable "unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Id.* at 691.

To state a section 1983 claim against a local government, a plaintiff must allege that the defendant is liable based on one of the following theories:

> (1) through an express policy that, when enforced, causes a constitutional deprivation; (2) through a "wide-spread practice" that although not authorized by written law and express policy, is so permanent and well-settled as to constitute a "custom or usage" with the force of law; or (3) through an allegation that the constitutional injury was caused by a person with "final decision policymaking authority."

*See Johnson v. Cook Cty.*, 526 F. App'x. 692, 695 (7th Cir. 2013) (quoting *Calhoun v. Ramsey*, 408 F.3d 375, 379 (7th Cir. 2005)); *see also Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010). Gaps in an express policy, or the absence of a policy, can give rise to a

8

claim. *See Calhoun*, 408 F.3d at 380. A plaintiff also must allege causation, and that the policy or custom was "the moving force" behind the constitutional violation. *See Estate of Sims ex rel. Sims v. Cty. of Bureau*, 506 F.3d 509, 514 (7th Cir. 2007) (quoting *City of Canton v. Harris*, 489 U.S. 378, 389 (1989)).

In the amended complaint, Plaintiffs basically claim that they could not gather information to plead a pattern or practice claim because the City denied their FOIA requests. They also allege that the City is liable under *Monell* because of the absence of a policy and a failure to train.

### A. Widespread Custom or Practice

Plaintiffs first attempt to satisfy the pleading requirements by pointing to the *lack* of information. That is, Plaintiffs argue that the City's denials of their FOIA requests prevented them from gathering information about the violation of their privacy and any other violations. *See* Am. Cplt., at ¶ 32 (Dckt. No. 32) ("All attempts to gather more information regarding this violation of privacy have been refused by the Defendant."); *id.* at ¶ 33 ("All other attempts to gather information regarding other violations committed by the Defendant have been met with resistance and refusal by the Defendant."). "By not responding to the Plaintiffs' FOIA requests, the Defendant has prevented the Plaintiffs from determining whether a pattern exists where the Defendant improperly responds to FOIA requests." *Id.* at ¶ 37.

A lack of information doesn't cut it. Plaintiffs must allege that the City maintains a pattern of violating the right to privacy, and they need to offer a factual, non-conclusory basis for that allegation. It is not sufficient to allege that a pattern might exist, or that information showing a pattern might be out there. It is not enough to allege that Plaintiffs lack the necessary information to meet the pleading standards.

If anything, the complaint itself confirms that Plaintiffs do not have facts supporting the existence of a pattern. Plaintiffs do not know "whether a pattern exists" because "Defendant has prevented the Plaintiffs" from finding out. *Id.* Plaintiffs have alleged a lack of information, but a lack of information cannot surmount the pleading standards.

"[A] plaintiff pursuing a widespread practice claim generally must allege more than one, and sometimes more than three, instances of misconduct." *Carmona v. City of Chicago*, 2018 WL 306664, at *2 (N.D. Ill. 2018) (citing *Thomas*, 604 F.3d at 303). "Courts in this District regularly dismiss *Monell* claims where the plaintiff has failed to allege instances of misconduct other than that from which he suffered." *Id.*; *see also Winchester v. Marketti*, 2012 WL 2076375, at *4 (N.D. Ill. 2012) ("What is fatal to the *Monell* claims, however, is that Plaintiff makes no attempt to plead a pattern of similar constitutional violations with any degree of factual specificity."). "[T]he more common paths toward *Monell* liability require proof either of an express policy that is unconstitutional or a widespread practice or custom *affecting other individuals* . . . ." *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 655 (7th Cir. 2021) (emphasis added); *cf. id.* at n.1 (noting that while plaintiffs can adequately plead *Monell* liability based only on their own experiences, such claims survive motions to dismiss when they allege repeated conduct from which a pattern can be inferred).

Plaintiffs have not provided any other example of the City disclosing private information to the incorrect person. Instead, they continue to rely on the one incident that gave rise to this lawsuit. *See* Am. Cplt., at ¶ 12 (Dckt. No. 32). To survive a motion to dismiss by alleging a widespread practice or custom, Plaintiffs must allege more than their own experience. A plaintiff must allege that "there is a true municipal policy at issue, not a random event." *Calhoun*, 408 F.3d at 380.

The fact that Plaintiffs could not acquire information about any other incidents through FOIA requests does not lessen the pleading requirements. A plaintiff must present "a series of violations" to state a claim under *Monell*. *See Palmer v. Marion Cty.*, 327 F.3d 588, 596 (7th Cir. 2003). "[P]roof of isolated acts of misconduct will not suffice . . . ." *Id.*; *see also City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker.").

Maybe the City did not respond appropriately to the FOIA request – the Court offers no opinion on that issue. But the lack of a sufficient response to a FOIA request is not a reason to lower the bar for pleadings. A *Monell* claim is not the right place to challenge the City's FOIA responses.

Plaintiffs also argue that the City's response to their FOIA request is "another clear example" of its inadequate policies and training. *See* Pls.' Resp. to Mtn. to Dismiss, at 3 (Dckt. No. 39). They suggest that the City's denials of their requests support their claims. But two examples do not demonstrate a pattern. *See, e.g., Wilson v. Cook Cty.*, 742 F.3d 775, 780 (7th Cir. 2014) ("Although this court has not adopted any bright-line rules for establishing what constitutes a widespread custom or practice, it is clear that a single incident – or even three incidents – do not suffice.").

Even if it did, it's not the type of pattern that injured Plaintiffs. The Petropouloses claim that an incorrect response to a FOIA request caused their injury. The injury came from a response to a FOIA request, not the lack of a response. The case is about a *mistaken* response, so recent information about the *lack* of a response does not move the needle.

11

Plus, even if the City had answered the request, it is entirely speculative to believe that it would have provided Plaintiffs with the information necessary to state a *Monell* claim. In its prior opinion, this Court explained that "a pattern of bungling FOIA requests might not give rise to a *constitutional* claim. To succeed, Plaintiffs would need to allege a pattern of violating constitutional rights by sending non-public documents to the wrong recipients." *See* 3/24/20 Mem. Opin. and Order, at 10 (Dckt. No. 28) (emphasis in original). A pattern of violating a right to privacy would require a pattern of sending *private* information to the wrong recipients. *Id.* ("To support a claim, Plaintiffs would have to allege that there is a custom or practice of violating constitutional rights by messing up FOIA requests."). If the City sent public information to the wrong recipients several times, it wouldn't be enough to state a claim. Sending *public* information to the wrong person pursuant to a FOIA request surely would not violate the right to privacy.

And here, once again, Plaintiffs have not alleged such a pattern. They haven't pointed to any other time when the City disclosed sensitive information to the wrong person. Maybe Plaintiffs do not have the information to make that allegation, but if so, that lack of information is a reason for dismissal, not a reason for allowing the case to go forward. Without any concrete basis to allege a broader pattern, Plaintiffs have not stated a claim under *Monell*.

### B. Absence of a Policy, or Gaps in an Express Policy

Next, Plaintiffs claim that the City's FOIA responses demonstrate that it lacks a method or policy to keep track of its mistakes. *See* Am. Cplt., at ¶ 34 (Dckt. No. 32) ("Defendant's FOIA responses indicate it does not have a way to track mistakes in FOIA responses or FOIA violations similar to the violation that occurred in the Plaintiffs' situation."). Plaintiffs argue that their allegations demonstrate the City lacks necessary policies: "The culmination of the

12

Plaintiffs' experiences with the Defendant, which includes: (1) the improper distribution of their personal information; (2) the denial of a FOIA request; (3) the seeming inability to perform the search requested of; and (4) the willful disregard of another FOIA request conclusively shows that the Defendant lacks the policies necessary to perform the duties required under the Freedom of Information Act." *See* Pls.' Resp. to Mtn. to Dismiss, at 3 (Dckt. No. 39).

*Calhoun* recognized that a plaintiff can state a claim by pointing to gaps in an official policy. *Calhoun*, 408 F.3d at 380 ("A second way of complaining about an express policy is to object to omissions in the policy."). But a policy, or the absence of a policy, still needs to be the "moving force" behind the violation. *See Estate of Sims*, 506 F.3d at 514.

Plaintiffs suggest that the City's responses to their FOIA requests show that it lacks a policy to track FOIA response errors. But the lack of a policy to track mistaken FOIA responses was not the "moving force" behind the Petropouloses' injury. The mistake *itself* was.

"*Monell* recognized that the premise behind a § 1983 action against a government body is 'the allegation that official policy is *responsible* for the deprivation of rights.' In applying the different theories of liability recognized under *Monell,* we have always required plaintiffs to show that their injuries were caused by the policies or practices complained of." *Thomas*, 604 F.3d at 306 (citations omitted) (emphasis in original). Because "the connection between inaction and a resulting injury is more tenuous," "'rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee.'" *J.K.J. v. Polk Cty.*, 960 F.3d 367, 378 (7th Cir. 2020) (quoting *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 405 (1997)).

Like a custom or practice theory, a theory based on the lack of a policy requires "more evidence than a single incident to establish liability." *Hahn v. Walsh*, 762 F.3d 617, 637 (7th

13

Cir. 2014) (quoting *Calhoun*, 408 F.3d at 380). The Seventh Circuit has explained that one incident is not enough "because it is necessary to understand what the omission means." *Calhoun*, 408 F.3d at 380. "No government has, or could have, policies about virtually everything that might happen. The absence of a policy might thus mean only that the government sees no need to address the point at all . . . ." *Id.* When a plaintiff relies on a gap in official policy to support his claims, "he must provide enough evidence . . . to permit an inference that the [entity] has *chosen* an impermissible way of operating." *Id.* at 381 (emphasis added).

Plaintiffs have not pointed to any other FOIA response errors. The bare allegation that the City lacks a process to track mistakes in FOIA responses does not mean that the City has *chosen* to make mistakes in FOIA responses. Maybe the City doesn't track FOIA mistakes because it does not make mistakes often enough to justify tracking mistakes. Maybe the juice isn't worth the squeeze.

Standing alone, the complaint does not contain enough facts to support the notion that the lack of a policy is meaningful under *Monell*. It's hard to see how the City should have had a policy to track mistakes when there is no indication that the City *made* other mistakes. There is no apparent need for error-tracking because there are no facts suggesting that there are any other errors. It is entirely speculative to suggest that the lack of a policy to track mistakes was the moving force behind the mistake in the first place. *See Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017) ("The critical question under *Monell* . . . is whether a municipal (or corporate) policy or custom gave rise to the harm (that is, caused it), or if instead the harm resulted from the acts of the entity's agents.") (citation omitted); *see also id.* ("As we put the point in one case, 'a person who wants to impose liability on a municipality for a constitutional

14

tort must show that the tort was committed (that is, authorized or directed) at the policymaking level of government.'") (quoting *Vodak v. City of Chicago*, 639 F.3d 738, 747 (7th Cir. 2011)) (cleaned up).

### C. Failure to Train

Finally, Plaintiffs believe the City "failed to adequately train and supervise employees' activities on FOIA responses and on a sensitive topic in a manner that would eliminate or prevent such privacy violations." *See* Am. Cplt., at ¶ 35 (Dckt. No. 32). They included no additional facts to support the claim in the amended complaint, other than the responses to the FOIA requests, and the City's failure to respond to Plaintiffs' letter. *See* Exhibits to Am. Cplt. (Dckt. No. 32, at 17–18, 21–22 of 23); *see also* Am. Cplt., at ¶ 18.

But again, the facts about the FOIA responses do not support the City's liability for Plaintiffs' injuries. The Petropouloses allege an injury from an incorrect response to a FOIA request, not a refusal to provide the information in the first place. And especially not a refusal to provide information because of an overly broad request.

In addition, Plaintiffs have not pointed to any specific type of training that would have prevented their harm. Failure-to-train claims are a difficult theory of liability under *Monell*. "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (citation omitted). Courts therefore reject generic allegations about a failure to train. *See Carmona*, 2018 WL 306664, at *3 (collecting cases); *see also Foy v. City of Chicago*, 2016 WL 2770880, at *9 (N.D. Ill. 2016) (finding that the plaintiff failed to state a *Monell* claim because the allegations were boilerplate, plaintiff failed to articulate what specific training was lacking, and plaintiff failed to support an inference that the lack of training caused the alleged constitutional violation).

Plaintiffs argue that the FOIA responses show that the City "does not train its employees properly when it comes to answering FOIA requests" and demonstrate an "apparent lack of preparedness . . . when it comes to responding to FOIA requests." *See* Pls.' Resp. to Mtn. to Dismiss, at 3 (Dckt. No. 39).

Alleging that there wasn't enough training, without specifics, isn't enough. It's too generic to support an inference that the City caused the injury. And nothing from the City's responses tends to show that its employees weren't prepared to respond – only that they would not respond to overly broad requests. *See* 5/11/20 Letter (Dckt. No. 32, at 17–18 of 23); 5/12/20 Letter (Dckt. No. 32, at 21–22 of 23).

*Monell* claims require allegations of specific failures to train. *See, e.g.*, *Hardy v. Wexford Health Sources, Inc.*, 2015 WL 1593597, at *14 (N.D. Ill. 2015) ("Absent allegations of what training or staffing was lacking and how that deficiency impacted Hardy's health or that of his fellow inmates, Hardy has failed to state a claim for deliberate indifference due to failure to train and a failure to provide adequate staffing."); *see also Connick*, 563 U.S. at 62 ("Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights.").

Failure-to-train claims also typically require facts supporting a pattern. *See Connick*, 563 U.S. at 62 ("A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train.") (citation omitted); *Mendez v. City of Chicago*, 2019 WL 4934698, at *3 (N.D. Ill. 2019) ("Inadequate training *can* form the basis of municipal liability, although a pattern or program of constitutional violations usually is required to make out the necessary fault and causation claims.") (emphasis in original).

16

Plaintiffs haven't pointed to any specific training failures or a pattern suggesting that the City's failure to train its employees caused their injury. Without a concrete basis to allege a causal nexus, Plaintiffs cannot satisfy the requirements for a failure-to-train claim.

All told, Plaintiffs haven't stated a claim under any theory of *Monell* liability. As a result, Counts I and II are dismissed.

## II. Plaintiffs' State-Law Claims

Both federal claims are dismissed, but Plaintiffs also allege claims under state law. The supplemental jurisdiction statute provides that the district court "may decline to exercise supplemental jurisdiction" over state-law claims if the Court has "dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3); *RWJ Management Co. v. BP Prods. N. Am., Inc.*, 672 F.3d 476, 479 (7th Cir. 2012). While the Court's decision is discretionary, "[w]hen all federal claims in a suit in federal court are dismissed before trial, the presumption is that the court will relinquish federal jurisdiction over any supplemental state-law claims." *Al's Serv. Ctr. v. BP Prods. N. Am., Inc.*, 599 F.3d 720, 727 (7th Cir. 2010). While the presumption is rebuttable, "'it should not be lightly abandoned, as it is based on a legitimate and substantial concern with minimizing federal intrusion into areas of purely state law.'" *RWJ Management Co.*, 672 F.3d at 479 (quoting *Khan v. State Oil Co.*, 93 F.3d 1358, 1366 (7th Cir. 1996)).

The Seventh Circuit has identified certain circumstances that may impact the presumption. For example, a federal court might keep a case with only state law claims if dismissal would create problems under the statute of limitations. A federal court also might retain a case if it had already devoted substantial resources to the dispute, or if it is easy to resolve the state-law claims. *See id.* (citing *Sharp Elecs. Corp. v. Metro. Life Ins. Co.*, 578 F.3d 505, 514–15 (7th Cir. 2009)).

That's not this case. Plaintiffs do not raise any statute-of-limitations problems with proceeding in state court. The case is at the pleading stage, so there is little concern about wasted judicial resources. And the parties disagree about substantial issues under state law. The best place to resolve these state-law claims is state court. Counts III through VIII are dismissed without prejudice.

## Conclusion

Defendant's motion to dismiss is granted. The Court grants Plaintiffs leave to amend by April 15, 2021.

Date: March 23, 2021

Steven C. Seeger
United States District Judge